May it please the Court, Bill Oley representing Public Utility District No. 1 for Grays Harbor County, Washington. This case involves a contract formation dispute between Grays Harbor and Idaho Power Company. First, I would like to give a brief description of the parties' negotiations to give rise to Grays Harbor's claim. Second, I would like to address why the substance of the claim and the error of the district court in ruling that such claims were completely preempted under the Federal Power Act and the Filed Rape Doctrine. And third, I would like to address the remedy that Grays Harbor is seeking in this case and why that also is not preempted. Grays Harbor is a small public utility district serving approximately 35,000 retail customers on the central Washington coast. It is a municipal utility district that purchases power to serve its customers. It does not speculate in the market. In the winter of 2000-2001, at the height of the – Oh, we got all these facts. Yes, I do. Would you like me to – I can go straight to the – I'd go right to the heart of it. To the issue, your Honor. This case involves, again, questions of contract formation and the enforcement of Idaho Power Company's tariff, market-based tariff, in the absence of an enforceable agreement that sets the actual dollar amount of that tariff. This is a question of tariff application and enforcement, not of tariff creation or alteration. Idaho Power Company characterizes this case as one where Grays Harbor is seeking to change FERC, the Federal Energy Regulatory Commission's, approved tariff. Well, essentially, they – I think in the supplemental briefing, they raise the parade of horribles that will occur if, in fact, you're – you know, you would be able to have a viable lawsuit that all around the country, people will be filing cases in front of judges who don't know – don't know nearly as much about energy as the people that are making these regulations that are determining the rates. And so we'll have, you know, judges all over the country deciding what the rate should be. They don't know anything about energy. Let me address it. That is simply not the case. And the reason that's not the case is that we're not asking – Grays Harbor is not asking this court to do something or create any precedents that don't already exist around the country. We are asking for equitable claims of rescission of the contract under unconscionability, duress, mutual or unilateral mistake. These claims have existed prior to the 2000-2001 power crisis, during the 2000-2001 power crisis, and afterwards. Grays Harbor brought its claim in October of 2002. Well, PERC has a whole system to do that, and they have people that are experts in that to do that. And their whole claim is that that's what Congress intended, and they don't want other people that don't know nearly as much about it doing that. I mean, that's why agencies get deference, and that's why Congress preempts certain areas, precisely for that reason. Well, I think there are a number of issues that you're addressing there. First, PERC itself defers to the courts on issues of common law contract formation. Under the Arkansas-Louisiana gas three-part standard, when you have – both places have jurisdiction when it's not preempted. And you've got to remember, the district court in this case ruled that it did not have jurisdiction to hear the claim. It didn't rule that it wasn't the right place, that you could – that it could have had jurisdiction, but that you should have brought the claim to PERC. In fact, if you look at PERC's jurisdiction, because of the timing, and because of when Grays Harbor was able to learn of the mistake that it made in entering into the agreement. Do you want a determination that you're owed money? And by the determination that you're owed money, some court has to determine what the energy's worth, and compared to what you paid for it, and how does the court avoid documents? I mean, these doctrines. There are two possible remedies here. I mean, you wouldn't be bringing a lawsuit if you didn't want money. You're right. And I think one of the cases – but let me explain how this works. Because there are two questions that we're asking the court, and the court in the supplemental briefing hit it right on the nose. The first is, was there an enforceable agreement between the parties? If there was an enforceable agreement between the parties, you've got to remember Ida Corps or Idaho Power Companies tariff. What is – what FERC approved is market-based rates. It's not a dollar amount. It's not the $249 that was in the contract between the parties. If there was – Wasn't that the market rate at the time? It was the rate that was negotiated between the parties, and it is the mistake – the mistake that Grays Harbor made was in the winter of 2000-2001.  Oh, in California, we know only too well. Yes. We're in the total toilet in California for – It had a power deficit. And one of the issues that Grays Harbor was – Not Los Angeles. I understand. It has the DC circuit all the way down from the Dalles all the way down to Los Angeles, yes. Santa Barbara's got its own lake. But the issue – one of the issues here, one of the big issues for Grays Harbor was the timing, when it purchased. It purchased in March of 2001 for delivery over the next winter because it saw a power shortage. California was experiencing blackouts. Grays Harbor has a legal obligation and a moral obligation to meet its load. It can't – if it drops load in the middle of the winter, that's people on the coast without heat. It has to purchase power. It made the decision when it did to purchase the amount of power that it did because of its mistaken belief that the shortages were real. And as we learned after the Enron bankruptcy in the middle of 2002, those shortages weren't real. Those shortages were artificial. And as we just learned a month ago when the Department of Justice released scores of tapes from Enron, that it was – Answer my question. The 249 may have been the market rate, but it was not a legitimate market rate. Is that right? Well, when you have a market-based rate tariff, what sets the dollar amount for that market-based rate is the price that the parties agree it's going to be. And so, yes, under that mistaken belief, Grays Harbor entered into the contract at $249. If under the common law theories of rescission that we've advanced, if that's an enforceable – That was the legitimate market rate. Yeah. If that's an enforceable contract, then, yes, that's the market-based rate. If that's not an enforceable contract – Let me ask you this. I mean, you're claiming the contract was illegal because of dysfunction and manipulation in the marketplace. So why not just come in and ask for declaratory relief and ask that the contract be declared void? Now, just stop and think about that. Now, if a court does that, it's not getting in this business of rates. All right. So let's say that you ask for that relief, declaratory relief. Contract is void because of manipulation and dysfunction and all the rest of it. And then where are you? Where you are is that you have a delivery of power by Idaho Power Company to Grays Harbor without an agreement setting the dollar amount of that transaction. It's like any other – under the Uniform Commercial Code or anything else, where it basically puts you into quantum merit, but in a regulated industry. So what the court's duty to do and what the courts have done in the past is enforce the tariff. The tariff is market-based rates, but you don't have an agreement between the parties setting the dollar amount. And if you really look at it, what happened is Idaho Power Company was – Now, why wouldn't it go back to FERC and they could handle the rates situation? Well – What's wrong with that? FERC's already said it was okay, hasn't it? No, FERC has not said it was okay, first of all. FERC doesn't decide whether a contract was validly formed or not, right? FERC defers to the courts to answer that question. It defers to the courts. So just hypothetically, let's say the courts conclude that the contract that your client entered into with a power company, with a wholesaler, was unconscionable or the result of manipulation of the market and the rest of it. All right, then you go back to FERC and you say, you know, this contract is void. It's invalid. We didn't have a contract. Then what's FERC going to do? Well, if you have to go back to FERC in taking that assumption – Well, I'm not saying that. Yeah. I think you're going to have to go back to FERC. What they would do is they would apply the market-based rate to that delivery of power. And if you – you've got to think, if Idaho – if there was no enforceable agreement, Idaho Power Company was under no obligation to deliver that power. They could have turned it off at any time. But FERC has already gone through that analysis in a similar case, haven't they, and said that that was the market-based rate at the time? No. And they approved market rate? No. FERC has not made that determination. FERC's – the docket at FERC is a docket that was started by one of the other companies up here that – and it was an evaluation of whether refunds were due under FERC's unjust and unreasonable standard, which is different than the standard we're asking the court to apply here. And what FERC ruled was that because some players are jurisdictional – Idaho Power Company is jurisdictional – FERC can order a refund from them, but Grace Harbor is not jurisdictional. They're a public utility. They – FERC could not order Grace Harbor to pay a refund. What FERC determined was that we're not making any ruling if the market was unjust or unreasonable. We're not making any ruling like that. What we're saying is we can't give a class-wide remedy for everybody, and we are not going to exercise our discretion to give a piecemeal remedy. That's what FERC determined, and that is on appeal, and Grace Harbor is participating in that appeal. Grace Harbor has some specific issues that are unique to itself and whether or not you could ever get a remedy on unjust and unreasonable rates from FERC, but that isn't an issue I can't address. You want to get money out of this litigation, right? Yes. How is that going to be done without the court determining rates? Well, you need to understand the court can interpret and enforce a rate, a dollar amount rate. FERC has said we're not a collection agency. We're not the people that go out and enforce you owe us money. What the court is going to do is enforce the market-based tariff at the time the power was being delivered because that, if you look at quantum merit or the obligation of how the power was being delivered at the time, if there was one. Is the court going to determine that market-based rate? Yes. The court is going to determine the market-based rate. It still goes back to why isn't that exclusively FERC's job? Because, well, think of it this way. If FERC had set the tariff, FERC did set the tariff, but it isn't a specific dollar amount. It's market-based rates. If FERC had set, say, the tariff, it was a flat rate tariff, $45 per megawatt hour, and there was a delivery without a contract, then all the court would do is assign $45, number of megawatts, that's how much you owe for the power that was delivered and consumed without a contract. What the court is going to do in this case is nothing different except it's going to apply a formula instead of a straight dollar amount. It's going to apply a market-based formula, and courts do that all the time, under the Uniform Commercial Code, under real estate transactions. But we're not supposed to get involved in determining rates, power rates. That's FERC's job. And I understand your question. I see that there's a distinction between what FERC does, and that is establishing tariffs, and what a court can do, has jurisdiction to do, and that is set a dollar amount. Everybody running to the courts seeking to have their agreements declared void because of this manipulation and fraud, and then you'd be asking the courts now to really get in there and apply formulas and set rates. And I don't think you're going to get courts to do that. Well, let me just – the first part of your question of whether or not parties can run to court and ask to have their contracts undone, they can already. The Fifth Circuit in Gulf states ruled that way. The First Circuit in town of Norwood ruled that way. The NRA, NRON, the supplemental authority that was put forward, the bankruptcy court specifically looked at the substance of the fraud in the inducement claim to determine whether or not they could bring that – whether or not there was substance. Did you give them any money? Excuse me? Did you give them any money? Well, no. In that case, in the NRON claim, the court said, you have no reasonable reliance, and you accepted the benefits after you learned of the fraud. They analyzed the substance. In the Gulf states, as I recall, the district court had exercised jurisdiction but sent it up immediately on interlocutory appeal. And the Fifth Circuit said, yes, you're right, under limited circumstances, the court can review whether or not you have an enforceable agreement. And once you have or do not have an enforceable agreement, then enforce the party's obligations. The First Circuit specifically said that – I can find the quote here. The tariff may be protected by the filed rate doctrine, but whether a tariff applies to Norwood in this case depends on the extent of Norwood's contractual obligations. In the contractual obligations, the court does have jurisdiction to hear. Now, one of these cases, and I can't remember which one, hinted at what appeared to be a transfer of a case after a finding that a contract wasn't enforceable under some circumstances back to FERC to make a determination on what the rate would have been. I'm probably not quoting it correctly, but I do recall reading that, and I'm not exactly certain of the process that would be involved in a case like that, but it could be a situation where you have a declaratory judgment and then where the party's left with or the parties are left to file an international claim. Let me follow that up. Suppose you have a declaratory judgment. Suppose we had a contract for wheat here, okay, and wheat. Oh, yeah, okay. And Idaho or whatever, Grays Harbor, bought this wheat and stored it in a grain elevator and then it found out that this was a contract entered into it by mutual mistake or unilateral mistake relied on by the other party. And so the court would say, okay, we're going to give you a declaratory relief. The contract's no good. Grays Harbor, you return the wheat. And Idaho Corp., you return the money. Okay. Now, is power like wheat? Could you return power? An electron is an electron is an electron, yeah. I mean, you can. Now, you sold that power to a bunch of customers. Yeah. I mean, the power, I mean, it's a real-time commodity. But it's still fungible in the way wheat would be fungible, I guess. Yeah. So a declaratory relief order that you return the power and they return the money, is there any, I guess there's no rate setting in that, right? There's no rate setting. There's no effective rates there. Except that to determine that there was a mutual mistake in the first place, you'd have to look at the market rate to determine this wasn't really an honest-to-God market rate because the true market rate would have been X and this was Y. So to get the declaratory relief, you've got to go through that exercise, don't you? That is one part of it, and I can see where that could be a question of preemption. There are other issues that you could look at. One, again, as I pointed out, is when Grace Harbor entered into this contract and why it entered into the contract when it did was because of the mistake. And that doesn't go to the rate that it paid for it. That goes to the timing and the amount of power it purchased. If the shortage was not artificial, if it wasn't mistaken about the power shortage, it would have looked at $249 and said, that's ridiculous, I'm not going to pay that, I can wait. But when it's looking at blackouts in California, which are being fraudulently caused but unknown to it, it has to step back and say, we need to buy now or we're going to have people without heat next winter. I'd like to reserve my remaining time if I can. Thank you. Okay. May it please the Court, my name is Gordon Erspommer, and I represent the appellees, which are a holding company, a utility, and another affiliate of a holding company, which is the marketing arm, which is the most pertinent entity for your purposes today. I think it's important to start to understand that this contract involved here was a futures contract, often called a hedging contract. And the very purpose of that contract was to remove the risk for the buyer that power would not be available and to lock in a price. That is the very purpose of that contract. In every hedging contract, there's a winner and there's a loser. But in this case, the buyer got exactly what it bargained for. The seller was not a generator of electricity, but rather a marketer, a wholesaler of power. It bought that power from the very same market that the buyer was looking at at the time the contract was entered into. So they really are very similarly situated in the sense of their position vis-à-vis the market. The ultimate question in this case is whether or not the rate payers of the plaintiff or the rate payers and or shareholders of the defendants will suffer the financial consequences of what the buyer now believes to be an improvident decision to place that hedge contract. And or put differently and perhaps slightly more argumentatively, whether the Grays Harbor transaction alone will be the only one to be reformed among the 500,000 transactions reviewed by FERC in Northwest markets. And I say only slightly more argumentative because I want to emphasize the broader issues involved in this case. And that is. You're saying that you were a victim just like they were a victim and there's a whole lot of people out there like you. And but they want to have a remedy that no one else has. I'm saying that, but I'm not conceding that there was a, quote, victim in this case. And I think FERC actually has determined that there was not a victim in this case. And I think that's an important point I'm going to get to. But to give you a picture of what the issue is there. FERC has investigated the California spot markets and made certain determinations concerning the unjustness and unreasonableness of rates in the California spot market. However, in separate proceedings in which Grace Harbor was a party by means of intervention. And that's the Pacific Northwest proceeding, often called the Puget Sound proceeding. They determined that no rate relief or changes in any of the contracts would be were justified. Now, in that in that context of that proceeding, Grace Harbor intervened, took discovery, filed briefs, made the very same contract formation arguments it made in its lawsuit, and they were specifically rejected by FERC. And under the collateral attack doctrine, the City of Tacoma case, which was mentioned in our letter yesterday and the day before, and other well-established cases, the only way you can attack a determination of FERC is to take it up on appeal. And this case really represents an attempt to collaterally attack those findings of FERC. In fact, with respect to the question of contract formation that Grace Harbor is putting before the Court in this appeal, if you look at the carefully at the record in front of FERC, Grace Harbor tendered those issues to FERC, and FERC ruled against them. And I would refer specifically in the record to our request for judicial notice, Exhibit A, February 25th, 2004, at paragraph 68, which is the November 10th, 2003, decision of FERC. And I'll try to read this slowly. I have a tendency to talk quickly, but we believe that a showing of fraud, duress, or bad faith between the parties at the contract formation stage could be an alternative ground for modifying the challenged contracts. However, the complainants failed to make this showing. They also failed to meet the Sierra three-prong test or demonstrate that contract abrogation is justified based on the totality of the circumstances. There is not a single claim in this complaint or even described in the appeal by way or the supplemental briefing which has not been considered by FERC and rejected by FERC. And think of the larger context of this. There are 500,000 transactions, buy and selling transactions. FERC found in Puget Sound that there's an average of six intermediaries for any given quantum of power, buys and sells prior to the consumption. Unwinding those transactions based on any kind of theory, whether it be contract abrogation or some defect in formation would cause incredible problems. And FERC has gone into those in great detail in its decisions. And FERC has said no, that the circumstances do not justify contract abrogation. They do not justify contract modification. And Grace Harbor didn't even appeal that finding of FERC in the Puget Sound case. For the collateral attack doctrine to apply, of course, it need not have actually appealed. It would still be barred because the exclusive means for challenging that determination would have been an appeal. But more important, I want to get back to the issue that counsel started with for Grace Harbor, and that is what is the filed rate and what is the what is the what is the market rate? What you're telling us is that that FERC itself determines whether a contract is validly formed. Certainly can and does. In fact, the city of Montpelier case that they described, if you look in those factors that they outline there, uniformity is one of them. The importance of the issue, whether it has repercussions generally on the markets. Yes, FERC can determine formation. And in this case did determine formation at the very request of the plaintiff in this case. All these municipalities and local power companies that shelled out huge, huge sums of money. How are they ever going to get any relief? Well, they have gotten, you know. Well, they have gotten a lot of relief. They've gone to FERC and FERC has issued refunds of billions. It's not final yet, but billions of dollars of refunds in the in the so-called San Diego case. There are billions of dollars coming. Who pays those? Who pays those? The refunds all get done through the PX transactions in California to do an accounting. But basically, the people who sold the power have to pay the money back to the people who bought the power, mainly the utilities. There are huge refunds coming. But FERC is determined. What about the people that supplied the power? Those are the people that are paying the refunds. What about the Enrons? They're paying the billions. They are. And I have a little accounting, a tentative accounting from FERC here, my binder, where we have billions of dollars of refunds going back to the buyers, mainly the utilities. And the California Public Utilities Commission has, in effect, issued an order passing those back on to the rate payers. But the question about the effect of the California crisis on Western markets is an issue that's already been taken up by FERC. And we have the difference between the spot market, where the manipulation was allegedly occurring, and the long-term bilateral market in the Northwest, which is an entirely different kind of a market. The spot markets in California were a centralized market subject to what was called a single-price auction. And because of defects FERC found in the way the market was structured, the markets were subject to gaming, potentially subject to gaming or manipulation. However, the FERC found that that did not extend to the Pacific Northwest markets, which were largely bilateral contract markets using contracts one-to-one, company-to-company. The collateral estoppel that you're talking about right now, are you bringing that up in response to the court's request for supplemental briefing? Well, I don't think we need to bring up collateral estoppel because – That wasn't really the gist of how – No, I only mention – Themselves. I only mention collateral estoppel and res judicata because the – it's not necessary for the court to even reach those issues because the collateral attack doctrine would apply even if those determinations by FERC were not yet final. But I mention them because when you look at conflict preemption principles, you need – this Court would need to look at what FERC has done in these areas that Congress has exclusively committed to the authority of FERC. And you will find that all the relief they ask is not only inconsistent generally with the decisions made by FERC, but is inconsistent with the decisions they made on the very request that Grace Harbor made to FERC in connection with the Puget Sound proceeding. And I quoted that language from that decision. So it really kind of comes in as a subpart when we're going through our preemption analysis. I think it comes in there. It's not necessary to go to the collateral estoppel. But, you know, the real important point on the collateral estoppel is that even were there no collateral attack doctrine, this claim would have been precluded by collateral estoppel and res judicata by the failure of the Grace Harbor to appeal the determination made by FERC in the order denying remand. The time is now run. But let me get to another very important issue. In the supplemental briefing, I think there were some very fundamental issues I wanted to tackle with respect to the filing made by Grace Harbor. The first is they have mischaracterized what is the filed rate. The filed rate is not the market-based tariff. The market-based tariff gives the seller the right to sell at market-based rates, and it involves a predetermination by FERC that the prices resulting from those sales will be just and reasonable. So that is a fundamental part. But the market-based rate itself is contained in the actual content. I'm sorry. The filed rate itself is contained in the actual contract. And those rates, those filed rates, are filed with FERC, and they're in our request for judicial notice exhibits E and F. The actual rates are on file with FERC pursuant to the reporting requirements. And in the case of longer-term contracts, the actual contract is filed with FERC, and the rate in that contract becomes the filed rate. So they've mischaracterized what the filed rate is. Second, they're asking the court to, in effect, take over the responsibility of FERC, inconsistent with the market-based tariff, because they're asking the court to determine what a just and reasonable rate is in place of the filed rate on file with FERC. That runs counter to the entire thrust of the filed rate doctrine. And not only are they asking a judge or a jury, in this case a jury, to determine that rate, because you look at their complaint, They are asking the, the relief they're asking for focuses on the market conditions at the time of delivery, not the time of contracting. And FERC, of course, is focusing in the market-based tariff on the conditions that exist in the market at the time of contracting. They're trying to treat this as if this were a breach case, and it would be a UCC case where you would get damages based upon the contract, market prices in the contract compared to the time for delivery. This is not a breach case. And FERC determines prices based upon the market conditions under the market-based tariff at the time of contracting, not the time of delivery. And those rates are filed with FERC, and no court can disturb those. And the courts in Tank and Keogh, and there's a whole line of Supreme Court and Ninth Circuit cases that say you cannot get any relief whatsoever based upon a theory that is based upon a hypothetical rate different from that on file at FERC. In this case, that's at $249 a megawatt hour. That is the rate on file at FERC. And even in Gulf states, they don't go as far as... Let me ask you, when I was reading this case, it seemed to me that what FERC had approved were some words. The market rate or something like that. Market-based rate, I think. Market-based rate. Okay. That had been the filed rate that was approved. Now, I think what you're telling me now, that FERC actually went a step farther and, what, as sales were made or as a function of time, at certain intervals they would say, this is the market rate and we find it's reasonable or something? How does that work? It's a little complicated, but to oversimplify it, FERC makes a determination at the time they grant the market-based rate authority, an issue in order, that all rates charged by that seller are per se just and reasonable, and they do it in advance. However, afterwards, there are requirements for filing of the contracts themselves or the WSPP agreement, and in FERC there are reporting forms that must summarize the pricing, the volumes, other contract characteristics over time. In the case of the WSPP agreement, these are quarterly filings. Examples are Exhibits E and F of the papers. And that becomes the file rate approved by FERC, and if FERC thinks there's a problem, and in the case of Enron there was a problem, they revoked the market-based rate authority. Okay, so there is a place in the FERC determination where these words are transformed into dollar amounts. Exactly. And if you read the complaint, actually, on the amendment theory that they have of trying to enforce the file rate, you'll see that the actual sum of money paid by Grace Harbor is alleged. The total amount, $21,757,000 in paragraph 14 of the complaint. There's no issue as to the amount they paid, and that being the filed rate. That is the filed rate. That is the total sum that was paid, $21 million plus. That is the same amount that is contained in the filings made by the seller at FERC pursuant to the market-based rate authority. So, you know, there are so many levels on which this Court could not act in derogation of what has happened at FERC. I mean, first of all, you'd have to surmount the problem with the market-based rate authority and basically undo what FERC did in granting the market-based rate authority, which Grace Harbor would have had to appeal to the courts and never did. Second, you would have to reverse and, in effect, overrule determinations made by FERC generally as to relief in the northwest power markets, which FERC declined to order in both Nevada Power and in the Puget Sound proceedings. Third, you would have to, in effect, overrule first determinations made with respect to Grace Harbor itself on these very same formation issues, raising price unconscionability, mistake, and duress they made in the order-denying re-hearing in the Puget Sound proceeding, where they said we declined to order contract formation. And think about principles of conflict preemption on another level, which is the jurisprudence that FERC has with respect to relief from contracts or abrogating contracts is quite different than it would be in the various states around the country or the West, which might entertain common-law causes of action. In the case of contract modifications or contract abrogation at FERC, they apply something called the Mobile Sierra Standard, which does not depend on the bargaining position between the parties at all, but rather it focuses on the public interest generally and the considerations of what would happen if FERC starts going around abrogating or modifying prices in wholesale power contracts. I mean, if parties can't have confidence in a contract they're signing, what is going to happen to the wholesale power markets? How are they going to assure supply? And in this case specifically, in the context of a hedge contract, how could you ever have a system where people could mute risk or deal with risk through hedging if the courts are going to come back later and say, oh, the price at the time of delivery was different from the price you signed in the hedge contract? That would defeat the very purpose of the hedge contract and buyers would not be able to handle risk ahead of time by signing contracts that assure supply and at a fixed price. That's exactly what Grays Harbor wanted to do. And the only reason they've had buyer's remorse at this point in time is because FERC did take action after they signed the contract in June 19th, and it's the order of June 19th, extending price caps to the entire West. And so the prices did come down on the spot markets in the West, and at the time of delivery the prices were actually lower than the contract price. But at the time, and Judge Thompson, you asked this question, at the time the contract was formed, the record before FERC shows that the contract price was actually lower than the market prices were at the time. They got a deal. They actually got a good deal, and that's why they signed the contract with Idaho Power. And FERC found that the market was functioning properly. It was responding as a workably competitive market functions when under stress, I think is what FERC said, but that there were numerous buyers, numerous sellers, over 100 different sellers active in the bilateral Northwest market at the time, and that the prices reflected conditions such as shortness of supply. That was a reason for the volatility. And various other factors, the weather. There was a drought in the Pacific Northwest, which reduced the availability of hydroelectric supply and so on. I have about a minute left. I want to talk just a few seconds about amendment. There is no theory of this case put forward in the complaint or in the supplemental briefing that does not involve price relief. And Judge Callahan, I think you alluded to this earlier. This contract has been fully performed a long time ago. All the power was delivered. You can't undo the contract. I mean, electrons are fungible in a sense, in a physics sense, but they're not fungible in the sense of the market because the price of power varies considerably depending on the time of day, the time of year, the transmission constraints between the buyer and the seller. There's no way you can unwind this transaction in the sense of declaring it void and having a court or a jury or anyone determine a new market price. That market price was determined based upon the conditions that existed in the market on that specific day. The power was delivered. It was consumed. But the only issue here is price. And whether you call it declaratory relief price, which is what they called it in the supplemental briefing, that is the relief they want. They want a jury to determine a new price for this contract and disregard the filed rate, which is in the filings at FERC, pursuant to the market-based rate authority. And that's just something a court cannot do. That is the responsibility of FERC. Thank you. Thank you. Thank you. Very briefly, I'd like to respond to two points. First, the question that Grace Harbor is asking this Court to answer, the first question the district court is whether or not there was an enforceable contract. Because if there was an enforceable contract, if there was no enforceable contract, then the issue of what the dollar amount that was due and owing under the transaction is an open question. And maybe that question can be answered by a court in equity. And at that time, Idaho Power Company can put on its evidence, which it has done in this case numerous pages and pages of additional evidence outside the complaint, to show, hey, they paid $248 for that power. Then the market price for that power of $249 is the market price. They have the ability to put on that evidence. Grace Harbor should have the ability to do its discovery to determine whether or not that, in fact, was the price or if the market price applicable to the power that was actually delivered was something different. Second, I'd like to address what FERC was considering and the decision it made. I'm not actually sure where counsel was reading from, but specifically, I mean, FERC determined that it could not equitably provide a class-wide remedy. It never made a determination that Grace Harbor could not make out its common-law claims. Thank you. Thank you. The matter stands submitted. We'll go to number five.
judges: Pregerson, Thompson, Callahan